# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PHILIP SULLIVAN,             :
CHARLOTTE SULLIVAN,    :
                           :
        Plaintiffs,        :
                           :
v.                          :     Civil No. 3:03cv1203 (MRK)
                           :
JEFFREY STEIN, et al.,      :
                           :
        Defendants.     :

## MEMORANDUM OF DECISION

In this action, Plaintiffs Philip Sullivan and Charlotte Sullivan, *pro se*, sued twenty-eight

defendants, twenty of whom this Court has already dismissed from the case. *See* Rulings and Orders

[docs. ## 141, 212, 234]. The following Defendants remain: Farmington Police Chief Michael

Whalen; Farmington Police Officers Troy Williams, Daniel Devine, and Daniel Hebert; and the

Town of Farmington (collectively, the "Municipal Defendants"); Inspectors Gregory Zigmont and

Charles Coffey (collectively, the "State Defendants"); and scrap metal dealer J.W. Green Co., Inc.

("J.W. Green"). Plaintiffs' claims against the remaining Defendants arise from a dispute between

the Sullivans and certain of Mr. Sullivan's relatives, who were originally among the defendants in

this case and whom the Sullivans also sued in Connecticut state court for, among other claims: (1)

unlawfully evicting them from a dwelling at 37 Valley View Drive, Farmington, Connecticut (the

"Valley View residence"); (2) unlawfully entering that residence; and (3) stealing Mr. Sullivan's

bulldozer. This Court has had several occasions to address the Sullivans' claims and directs readers

to its prior opinions for additional background. *See, e.g.*, *Sullivan v. Stein*, No. Civ. 3:03 CV

1203(MRK), 2005 WL 2209301 (D. Conn. Sept. 12, 2005); *Sullivan v. Stein*, No. Civ. 3:03 CV

1203(MRK), 2004 WL 1179351 (D. Conn. May 21, 2004). Several state courts have also discussed the Sullivans' claims against their relatives. *See Sullivan v. Delisa*, AC25730, (Conn. App. Ct. June 5, 2007); *State v. Sullivan*, No. CR01106675, 2005 WL 895893 (Conn. Super. Ct. Mar. 11, 2005); *Sullivan v. Delisa*, CVN-009-1831 (Conn. Super. June 10, 2004) (slip op.) (reprinted as State Defendants' Local Rule 56(a)(1) Statement [doc. # 308] Ex. 2) (the "Housing Decision"); *Sullivan v. DeLisa*, CVN-009-1831FA, 2002 WL 523076 (Conn. Super. Jan. 10, 2002).

The Sullivans sue all of the remaining Defendants under 28 U.S.C. § 1983 for violations of their rights under the Fourteenth Amendment to the U.S. Constitution. In addition to their Fourteenth Amendment claims, the Sullivans also sue: (1) all of the Municipal Defendants for violations of the Connecticut Constitution and for intentional infliction of emotional distress; (2) Defendants Devine and Hebert for violations of the Sullivans' rights under the Fifth Amendment; (3) the Town of Farmington for violation of their rights under the Fourth Amendment; (4) the State Defendants for violations of their rights under the First, Fourth, Fifth, and Fourteenth Amendments;[1] and (5) J.W. Green for violating Article First of the Connecticut Constitution and for intentional infliction of emotional distress. *See* Second Amended Civil Rights Complaint [doc. # 251].

Currently pending before the Court are the Municipal Defendants' Motion for Summary

---

[1] Plaintiffs have also included a Sixth Amendment claim against the State Defendants in their Second Amended Civil Rights Complaint [doc. # 251]. However, this claim was never raised in the earlier versions of their complaint, the Sullivans did not seek permission to add this claim when they filed their most recent complaint (which was filed over two years after the Sullivans brought this lawsuit), and the claim is outside the scope of this Court's September 13, 2005 Ruling and Order [doc. # 247], which clarified which of Plaintiffs' claims remained. Therefore, Plaintiffs' Sixth Amendment claim is dismissed as beyond the scope of this lawsuit, and the Court will not address it further.

Judgment [doc. # 297] and the State Defendants' Motion for Summary Judgment [doc. # 306].[2] Defendant J.W. Green has not moved for summary judgment. Because the Court finds that there are no genuine issues of material fact and that the Municipal and State Defendants are entitled to judgment as a matter of law, the Court GRANTS the Municipal Defendants' Motion for Summary Judgment [doc. # 297] and the State Defendants' Motion for Summary Judgment [doc. # 306].

## I.

As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Plaintiffs. Further facts will be recited, as needed, in later sections.

Philip and Charlotte Sullivan are the son and daughter-in-law of the late Mary Crowell, with whom they lived in the Valley View residence from 1970 until the summer of 2000. The events at issue in this case occurred between approximately June 2000 and May 2001, when Mr. Sullivan was arrested on charges of eavesdropping on his mother in violation of Connecticut General Statutes §53a-189. *See* Plaintiffs' Memorandum of Law in Opposition to Municipal Defendants' Motion for Summary Judgment [doc. # 317] Ex. E para. 4 ("Pls.' Mem. In Opp'n to Municipal Defs."); Plaintiffs' List of Filings This Date [doc. # 353] Ex. 60.

On June 27, 2000, the Sullivans were informed that Ms. Crowell intended to move from her Valley View residence to a retirement community. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at 82-83. The Sullivans were given the option of purchasing the Valley View residence from Ms. Crowell, *see id.* at 84, but on July 6, 2000, the Sullivans declined the offer to purchase the

---

[2] Also pending are the Municipal Defendants' Motion to Strike Re Plaintiff's Opposition to Motion for Summary Judgment [doc. # 329]; Plaintiffs' Motion to Strike Portions of James Hyland's Affidavit [doc. # 344]; Plaintiffs' Motion to Strike Portions of Defendant Coffey's Affidavit [doc. # 345]; and Plaintiffs' Motion to Strike Portions of Defendant Zigmont's Affidavit [doc. # 346]. The Court will address these motions in a separate order.

residence, in order, so they say, to allow Ms. Crowell to receive the full value of her residence for purposes of paying the expenses of her assisted living accommodations, *see* Housing Decision at 3. Mr. Sullivan announced his decision not to purchase the house while he and his sisters, Maryanne Delisa and Kathryn Hyland, were present at the Valley View residence. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. E para. 5. When Mr. Sullivan declined to purchase the residence, Ms. Delisa and Ms. Hyland allegedly grew abusive, accusing the Sullivans of never paying rent. *See id.* In turn, Mr. Sullivan became unwilling to move out of the residence after Ms. Delisa accused Mrs. Sullivan of abusing Ms. Crowell, *see* Pls.' List of Filings [doc. # 353] Ex. 1B para. 1i, even though the Sullivans claim they were initially amenable to doing so, *see* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at 84; *id.* Ex. 5 at 160.

According to Mr. Sullivan, he experienced chest pain on account of his sisters' accusations. He then left the Valley View residence and was admitted to St. Francis Hospital, where he and his wife spent the night. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. E para. 5.

The next day, on July 7, the Sullivans and their relatives, including Ms. Crowell, returned to the Valley View residence. According to the Sullivans, the family members resumed their verbal assault on the Sullivans. Strong words passed between the Sullivans and their relatives, Ms. Delisa allegedly stuck her finger in Mrs. Sullivan's face, and Ms. Crowell allegedly poked Mrs. Sullivan with her cane. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at 73-74. Fearing for Mr. Sullivan's health and that physical violence might soon erupt, the Sullivans gathered up some of their belongings, left the Valley View residence, and stayed at the home of Mrs. Sullivan's father. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. A at 37-38. The Sullivans never again stayed overnight at the Valley View residence. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 6

at 47.

## A. The July 11 Incident Involving the Municipal Defendants

Four days later, on July 11, 2000, the Sullivans again returned to the Valley View residence. Ms. Delisa, her husband Thomas Delisa, and Ms. Hyland were already on the premises. *See id.* Ex. 4 at 33. Ms. Crowell apparently was not present. *See id.* at 34. Mr. Sullivan claims that Ms. Delisa again verbally accosted the Sullivans. She also accused the Sullivans of abandoning the residence and of never paying rent, she told the Sullivans that the house had been sold, and she ordered the Sullivans to vacate the premises. *See id.* Ex. 5 at 48. Mr. Sullivan responded by telling the Delisas and Ms. Hyland to leave the residence and, when they refused, Mr. Sullivan called the Farmington Police Department, requesting protection and assistance to remove his relatives from the Valley View residence. *See id.* Ex. 4 at 17-18. Farmington Police Officer Daniel Devine soon arrived, followed shortly thereafter by Chief Michael Whalen and Officer Troy Williams. *See id.* at 17, 20.

Mr. Sullivan informed the police that he and his wife were the lawful occupants of the Valley View residence, that his relatives were trespassing and harassing them, and that his relatives had no right to be on the premises. *See id.* at 26-28. Mr. Sullivan's relatives thereupon produced a key to the residence, which Ms. Delisa claimed Ms. Crowell had given them. *See id.* at 27, 34-35. Ms. Delisa also stated that Ms. Crowell had given them permission to be on the premises. *See id.* at 35. Mr. Sullivan's relatives told the police that Mr. Sullivan was not a tenant, had never paid rent, and had never done anything around the house. *See id.* at 25-26.

In order to demonstrate the work he had done around the residence, Mr. Sullivan took Officer Williams to the backyard. *See id.* at 26. There, he showed the officer tree limbs that Mr. Sullivan had removed with his bulldozer following a recent storm. The bulldozer was parked behind the

house. While behind the house, Mr. Sullivan pleaded with Officer Williams to remove his family members from the Valley View residence and told him that the situation might become violent. *See id.* Ex. 5 at 58. However, to the Sullivans' consternation, the officers did not remove Mr. Sullivan's relatives from the premises. Rather, pointing to the fact that the relatives had a key for the premises and claimed to have the permission of Ms. Crowell–the residence's owner–to be there, the police informed Mr. Sullivan that he would need to retain a lawyer and go to civil court in order to resolve his differences over the residence with his family members. *See id.* According to Mr. Sullivan, the officers also told him not to call the police again about his dispute with his family over the property. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. E paras. 11, 16. At this point, again allegedly fearing physical violence and concerned about Mr. Sullivan's health, the Sullivans left the property, taking several changes of clothing and no more. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 5 at 64. The Sullivans returned to the house of Mrs. Sullivan's father. *See id.* Ex. 6 at 37-38.

On July 20, 2000 and July 31, 2000, Ms. Crowell left phone messages for Mr. Sullivan advising him that she would be renting the Valley View residence and directing him to remove his belongings before August 6, 2000, when the door locks to the residence would be changed. *See* Pls.' List of Filings [doc. # 353] Ex. 1B para. 3; *id.* Ex. 11 at 125-26. Ms. Crowell also sent a letter to the Sullivans, which they received, advising them to remove their belongings by the August 6th date. *See* Pls.' List of Filings [doc. # 353] Ex. 1B para. 9a. On August 1, 2000, the Sullivans entered into a lease for an apartment in Newington, Connecticut, in which they have continuously lived since that date. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 5 at 16-17. While it is clear that the Sullivans have remained at the apartment in Newington for over six years, they consistently

characterize it as a "temporary shelter from the cold, the rain and the elements," and maintain that they never ceased residing at the Valley View residence. *See, e.g.*, Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. D at 16-18.

On July 30, 2000, Mr. Sullivan replied by letter to Ms. Crowell's messages, warning her not to move his belongings and directing her to inform any purchaser of the property of his tenancy at the Valley View residence. *See* Pls.' List of Filings [doc. # 353] Ex. 43. On August 20, 2000, Mr. Sullivan received a letter from Ms. Crowell's attorney, who renewed Ms. Crowell's demand that the Sullivans move out and warned them that the locks to the residence would soon be changed. *See id.* Ex. 1B para. 16. The Sullivans returned to the Valley View residence (though never stayed the night) several times between July 11, 2000, and September 7, 2000, on which date Mr. Sullivan discovered that his key to the residence no longer opened the door. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 6 at 47; Pls.' List of Filings [doc. # 353] Ex. 1B para. 18. Despite receiving multiple warnings and having many opportunities to do so, the Sullivans never removed their possessions from the Valley View residence or removed Mr. Sullivan's bulldozer from the property. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at 45, 86-87; *id.* Ex. 5 at 178.

**B.** **The September 7 Incident Involving the Municipal Defendants**

On September 7, 2000, Mr. Sullivan again returned to the Valley View residence, which Ms. Crowell had transferred by quitclaim deed to Ms. Delisa and Ms. Hyland on July 25, 2000. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. O. Mr. Sullivan discovered that the locks had been changed and also that his bulldozer was no longer in the backyard. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at 45, 87-88. He immediately called the Farmington police, and Officer Daniel Hebert arrived at the residence a few minutes later. Mr. Sullivan told Officer Hebert that his

bulldozer had been stolen. Officer Hebert asked Mr. Sullivan whether he could verify his ownership

of the bulldozer, and Mr. Sullivan responded that he had papers attesting his ownership, but that the

papers were located in the Valley View residence and that his key no longer opened the door. *See*

Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. J at 47. Officer Hebert also confirmed that,

while Mr. Sullivan claimed that he still lived at the Valley View residence, his contact address was

at his father-in-law's house in Newington. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at

50.

Officer Hebert then radioed for another officer, and Officer Devine soon appeared on the

scene. Mr. Sullivan claims that Officer Devine informed him that he knew where Mr. Sullivan's

bulldozer was, and he warned Mr. Sullivan that if he did not actually own the bulldozer, Mr. Sullivan

would be arrested. *See id.* Mr. Sullivan never heard back from either Officer Hebert or Officer

Devine regarding the whereabouts of his bulldozer, and Mr. Sullivan eventually requested a copy

of the police report of the incident. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. E

para. 28. When he received the police report, Mr. Sullivan discovered that Officer Hebert had

interviewed Mr. Delisa, who admitted that he had removed the bulldozer at Ms. Crowell's request,

had sold the bulldozer for scrap value, and had given the sale proceeds to Ms. Crowell.[3] *See id.*

(attached incident report). The police report also noted, falsely according to the Sullivans, that Mr.

Sullivan had moved from the Valley View residence and was engaged in longstanding litigation with

his family members. *See id.*

The Sullivans then filed an entry and detainer action against their relatives in state court on

_____

[3] Mr. Sullivan later learned that J.W. Green had been involved in the removal and sale of the
bulldozer, which forms the basis of the Sullivans' claims against J.W. Green. *See* Second Am. Civil
Rights Compl. [doc. # 251] at 40.

September 18, 2000. The background to that action is described in *Sullivan v. Delisa*, 2002 WL 523076, in which Judge Juliett Crawford of the Connecticut Superior Court denied the Sullivans' application for a prejudgment remedy in the amount of $ 231,251.00 against Ms. Delisa, Ms. Hyland, and Ms. Crowell. Judge Crawford rejected this application, in part because she found that "[t]he evidence presented [was] not indicative of a landlord-tenant relationship" between the Sullivans and Ms. Crowell. *Sullivan v. Delisa*, 2002 WL 523076, at *6. Two years later, in a ruling on the merits of the Sullivans' entry and detainer action, state Superior Court Judge Angelos dos Santos credited testimony given by the late Ms. Crowell that Mr. Sullivan told her he would move out of the Valley View residence on July 7, 2000,[4] and that he and Mrs. Sullivan had abandoned the residence that evening. Accordingly, Judge dos Santos found as a matter of fact that the Sullivans had no possessory interest in the Valley View residence after July 7, 2000. *See* Housing Decision at 10-12. Judge dos Santos also made a number of other factual findings that are relevant to this case and that are discussed below. The Sullivans promptly appealed Judge dos Santos's decision, and the Connecticut Appellate Court issued an advance release opinion affirming Judge dos Santos's opinion on May 30, 2007. That opinion will be officially published on June 5, 2007.

**C.     The Incidents Involving the State Defendants**

At all relevant times, Gregory Zigmont and Charles Coffey were Inspectors assigned to the State of Connecticut Statewide Prosecution Bureau of the Office of the Chief State's Attorney. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 2; *id.* Ex. 9 para. 2. On September 29, 2000,

---

[4] The Connecticut Appellate Court noted in its ruling on the Sullivans' appeal of Judge dos Santos's opinion that Ms. Hyland, not Ms. Crowell, testified that the Mr. Sullivan stated he and his wife were moving out of the residence on July 7, 2000. See Sullivan v. Delisa, AC25730, slip op. at 13 n.4. The Appellate Court found that any mistake the Superior Court made in misstating the source of the evidence was harmless.

Inspectors Zigmont and Coffey went to the Valley View residence in response to a criminal complaint against Mr. Sullivan that James Hyland–Ms. Crowell's son-in-law–had submitted on behalf of Ms. Crowell to the Connecticut Department of Civil Justice sometime after September 14, 2000. *See id.* Ex. 8 para. 5; *id.* Ex. 4 at 92-94. The complaint accused Mr. Sullivan of illegally taping Ms. Crowell's telephone conversations without her permission. *See* Pls.' List of Filings [doc. # 353] Ex. 29.

Inspectors Zigmont and Coffey specifically went to the Valley View residence in order to meet with Mr. Hyland, whom Ms. Crowell had directed them to contact and who suggested meeting at the Valley View residence. *See id.*; Local Rule 56(a)1 Statement [doc. # 308] Ex. 7 para. 39. Mr. Hyland explained to Inspectors Zigmont and Coffey that he believed that the Sullivans had abandoned the premises and their belongings in early July, that the locks to the house had later been changed, that the Sullivans did not have keys or access to the premises, that the Sullivans had recently filed an entry and detainer action against his family in the Connecticut Housing Court, and that he had authority to consent to the Inspectors looking around the entirety of the house. *See id.* paras. 44-46. Mr. Hyland then explained to the Inspectors that he, his wife Kathryn, and the Delisas had found several audiotapes while cleaning up the house after the events of July 11, 2000, and that several of these audiotapes contained conversations between Ms. Crowell and her children. *See* Pls.' List of Filings [doc. # 353] Ex. 4. Mr. Hyland informed Inspector Zigmont that neither he nor Ms. Crowell had consented to the taping of one conversation that Mr. Hyland provided to them. *See id.* Ex. 3 at 1; Local Rule 56(a)1 Statement [doc. # 308] Ex. 7 para. 19.

Mr. Hyland also told the Inspectors of several alterations that had been made to the telephone wires within the Valley View residence that Mr. Hyland did not believe to be the work of the

telephone company. *See id.* Ex. 8 paras. 20-21. These alterations consisted of "some junction boxes that were apparently added on to the phone system," Local Rule 56(a)1 Statement [doc. # 308] para. 90, and "a telephone junction box that was nailed to a wall, some sort of phone line switching box as well as some headphones," *id.* para. 91. Mr. Hyland, an engineer, said that he believed that Mr. Sullivan had used this equipment to record and listen to Ms. Crowell's phone calls, as evidenced by the audiotapes.[5] *See* Pls.' List of Filings [doc. # 353] Ex. 53 at 2. Mr. Hyland gave the Inspectors three audiotapes on September 29, 2000, *see* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 36, which was the only property the Inspectors removed from the property on this date, and he also showed them the alterations to the phone lines, as well as the garage and den, in which all of the Sullivans' belongings were then stored, *see id.* para. 34.

On January 8, 2000, Inspector Zigmont interviewed Ms. Crowell and her son Martin. *See id.* paras. 41, 47. Inspector Zigmont played for Ms. Crowell one of the tapes that Mr. Hyland had given to him, and he took a sworn statement from Ms. Crowell, in which she stated that she had not consented to the taping of her conversation. *See* Pls.' List of Filings [doc. # 353] Ex. 3. Ms. Crowell also stated that on one occasion, she spoke on the telephone with her son Martin about a missing safe deposit key and that the key had mysteriously re-appeared in its accustomed place the following day. *See id.* Martin Crowell corroborated the telephone conversation. *See* Local Rule 56(a)1 Statement [doc. # 308] para. 126.

On January 22, 2001, Inspector Zigmont returned to the Valley View residence, but he did

_____

[5] Mr. Sullivan admits that he altered the phone lines and that the equipment listed belonged to him, but states that he only used it during the course of broadcasting political messages to the registered voters of Farmington, Connecticut, and that Ms. Crowell knew that this was the purpose of the equipment.

not enter the house.  From the exterior of the home, he looked through a window into the den and garage and saw a black box with headphones and a box of audiotapes sitting on the interior den windowsill.  The next day, he completed an application for a search warrant for the Valley View residence in order to retrieve the items left on the windowsill, as well as any other pertinent evidence.  Inspector Zigmont submitted this warrant application on January 23, 2001, and it was granted by Connecticut Superior Court Judge Douglas S. Lavine on that date.  *See* Pls.' List of Filings [doc. # 353] Ex. 53 at 5.  Inspector Zigmont executed the warrant on January 25, 2001, and removed the black box, headphones, and audiotapes from the Valley View residence.  *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 paras. 60-61.

Some of these audiotapes allegedly contained the political opinions of Mr. Sullivan.  The Sullivans allege that, at some point in time, Inspectors Zigmont and Coffey "observed, read and listened to plaintiff Philip Sullivan's political writings and expressions set forth in his seized cassette tapes."  *See* Second Am. Civil Rights Compl. [doc. # 251] at 26-27.  According to the Sullivans, these writings "dare to reveal a magnitude of corrupt subversive mis-information and government conduct."  *Id*. at 27.

On April 3, 2001, Inspector Zigmont again interviewed Ms. Crowell and also interviewed Ms. Hyland.  *See* Pls.' List of Filings [doc. # 353] Ex. 59.  After listening to a tape previously given to Inspector Zigmont by Mr. Hyland, both Ms. Crowell and Ms. Hyland signed sworn statements that the voices on the tape were theirs and that they had not given consent to the recording of the tape. *See id.*  On April 19, 2001, Inspector Zigmont again spoke to Mr. Hyland, who told Inspector Zigmont that he had found a sales catalog and video for what Mr. Hyland described as eavesdropping and surveillance equipment, and that these items were still in the Valley View residence.  *See* Pls.'

List of Filings [doc. # 353] Ex.16 at 2A. Mr. Hyland stated that within this catalog was a bill of sale with an attached credit card receipt that was filled out in the name of Philip Sullivan, *see id.* at 3, and that the catalog had handwritten notes next to certain eavesdropping devices. On the basis of this information, Inspector Zigmont completed an application for another search warrant application, which appears to have been granted by the Superior Court on April 19, 2001. *See id.* at 5. Inspector Zigmont executed the second warrant on April 20, 2001, and he removed the sales catalog and video from the residence. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 paras. 76-80.

Inspector Zigmont completed an application for Mr. Sullivan's arrest on May 10, 2001. The warrant application was signed by Assistant State's Attorney Terri Sonnemann, *see* Pls.' List of Filings [doc. # 353] Ex. 17; Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 89, and was granted by Connecticut Superior Judge Wendy Susco on May 17, 2001, *see id.* para. 90.

Inspector Zigmont arrested Mr. Sullivan on criminal eavesdropping charges on May 25, 2001. *See id.* para. 91. The criminal proceedings were continued for four years while the Sullivans' entry and detainer suit was litigated in Housing Court. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 6 at 71; Pls.' List of Filings [doc. # 353] Ex. 22B at 1. The State ultimately entered a plea of *nolle prosequi* on the eavesdropping charges on April 1, 2005, following both the death of Ms. Crowell and a ruling by a Superior Court judge that her pre-death statements would be inadmissible in the trial of Mr. Sullivan. *See* Pls.' List of Filings [doc. # 353] Ex. 24; *State v. Sullivan*, 2005 WL 895893.

## D.    The Filing of This Action

The Sullivans filed this action on July 10, 2003, before resolution of their housing action and the criminal case against Mr. Sullivan. After the Court granted motions to dismiss filed by a

majority of the original defendants, *see* Rulings and Orders [docs. ## 141, 212, 234], the Court permitted Plaintiffs to file their Second Amended Civil Rights Complaint [doc. # 251],[6] which they untimely filed on October 3, 2005. The Court nevertheless accepted the complaint.

In motions to this Court and during the course of their depositions, the Sullivans later opposed the taking of discovery on certain subjects because they contended that the requested discovery might jeopardize their housing claims, should they prevail on their appeal of Judge dos Santos's 2004 ruling. On October 11, 2006 and December 21, 2006, the Municipal and State Defendants filed their respective motions for summary judgment. The Sullivans moved for an extension of time for the filing of their response to the Municipal Defendants' motion until the Court ruled on their motion to compel, which they had filed on October 10, 2006. *See* Motion for Discovery Intervention [doc. # 293]. The Court granted the motion for extension. *See* Plaintiffs' Motion for Extension of Time [doc. # 301]; Order [doc. # 303]. On November 21, 2006, the Court denied Plaintiffs' Motion for Discovery Intervention. *See* Ruling on Motion to Compel [doc. # 305]. The Sullivans claimed never to have received that ruling, because when they received the State Defendants' motion for summary judgment in December, they informed the Court that they would not respond to that motion either until the Court had ruled on their Motion for Discovery Intervention. *See* Plaintiffs' Notice to the Court & Defendants [doc. # 312]. The Court again allowed the Sullivans additional time to respond to both summary judgment motions, even though it had ruled on their motion to compel nearly two months before. *See* Order [doc. # 313].

On January 22, 2006, the Sullivans moved for a further extension of time, *see* [doc. # 314],

---

[6]While titled the "Second Amended Civil Rights Complaint," this complaint was actually the fourth complaint filed in this action by the Plaintiffs.

and the Court granted them an additional month in which to respond to the summary judgment motions, *see* [doc. # 315]. On the day before their extended deadline, the Sullivans filed an opposition to the Municipal Defendants' motion, *see* [doc. # 316], moved to strike the State Defendants' motion and to stay the pending action, *see* [doc. # 320], and moved to amend their complaint yet again to add another theory of liability against the Town of Farmington, *see* [doc. # 321]. The Court denied both motions and directed the Sullivans to respond to the State Defendants' motion on or before March 30, 2007. *See* Ruling and Order [doc. # 327].

On April 3, 2007, the Sullivans filed an untimely and incomplete response to the State Defendants' Motion, informing the Court and the Defendants that they would supplement their memorandum in one week's time with footnotes and exhibits. The Court permitted the filing. *See* [docs. ## 347, 348]. The Sullivans also moved at that time to strike three exhibits submitted by the State Defendants. On April 9, 2007, the Sullivans filed their amended response to the State Defendants' motion. State Defendants filed their reply on April 23, 2007. The Sullivans, without seeking leave, filed a sur-reply on May 7, 2007. The Court nevertheless has considered all of the Sullivans' filings in its analysis of the Defendants' summary judgment motions.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)

(internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of Plaintiffs, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials . . . ." Fed. R. Civ. P. 56(e). Rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

The Court notes two preliminary matters. First, in their brief, the Sullivans represented to the Court that they no longer intend to pursue any claims against the Municipal Defendants under the Connecticut Constitution. *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] at 45.

Therefore, the Court will grant judgment for the Municipal Defendants on the Sullivans' claims based upon the Connecticut Constitution.

Second, all moving Defendants argue that the Sullivans are collaterally estopped from denying or attacking certain factual findings made by Judge dos Santos in his 2004 opinion in the entry and detainer action, and that Judge dos Santos's findings preclude a reasonable jury from returning a verdict for the Sullivans on any of their federal claims. The Court has already ruled that some of the determinations reached by Judge dos Santos have preclusive effect in this action, and the Court will not repeat its prior ruling here. *See* Ruling and Order [doc. # 327]; *Sullivan v. Stein*, 2005 WL 2209301, at *3. Suffice it to say that the Court holds that the Sullivans are bound by the following rulings of Judge dos Santos:

(1) the Sullivans did not have a possession of the Valley View residence after July 7, 2000, *see* Housing Decision at 10-12;

(2) the Sullivans were at no time the tenants of Ms. Crowell, *see id.* at 9-10;

(3) the Sullivans' "possession of the master bedroom or family room or the other portions of the property was not exclusive," *id.* at 11;

(4) the Sullivans "by their actions abandoned their possession of the" Valley View residence "as defined in Section 47a-43" of the Connecticut General Statutes, *id.* at 12;

(5) the Sullivans' family members "did not violate the provisions of" Connecticut General Statutes § 47a-16, *id.* at 13; and

(6) the Sullivans "had ample opportunity to remove the bulldozer and their personal property from the property, but admitted they had no intention of removing their

belongings from the property . . . .  Consequently, the plaintiffs have failed to prove . . . that their personal belongings were stolen by" their relatives, *id.* at 15.

However, in their briefs, the Sullivans argue, once again, that the Defendants cannot rely on any issues decided by Judge dos Santos because the Sullivans are appealing his decision.  As the Court has already noted, however, the Connecticut Appellate Court has issued an advance release opinion affirming Judge dos Santos's opinion.

Moreover, to the extent that the Sullivans may now attempt to argue that they may still appeal the most recent ruling to the Connecticut Supreme Court, their argument still fails.  As this Court has previously stated in its Ruling [doc. # 327] on their Motion to Strike State Defendants' Motion for Summary Judgment and Motion for a Temporary Stay [doc. # 320], the fact that the Sullivans may appeal a lower court's decision does not alter the Court's conclusion that Judge dos Santos's findings are entitled to preclusive effect in this action, unless and until they are reversed on appeal.  *See Labow v. Rubin*, 95 Conn. App. 454, 467 (App. Ct. 2006) ("[T]he plaintiff's pending appeal in the partition action does not preclude the application of collateral estoppel to her quiet title count."); *Carnemolla v. Walsh*, 75 Conn. App. 319, 327-28 (App. Ct. 2003) ("Because collateral estoppel is a much narrower aspect of res judicata, and a pending appeal does not preclude the application of res judicata, we conclude that the plaintiff's pending appeal in the criminal action did not preclude the defensive application of collateral estoppel in the civil action.").  The foregoing issues were "actually litigated and determined by a valid and final judgment, and [were] essential to the judgment." *LaSalla v. Doctor's Assocs.*, 278 Conn. 578, 587 (2006).[7]  Therefore, the Court will not

---

[7] Plaintiffs additionally argue that they should not be bound by collateral estoppel because none of the moving defendants was a party in the state court action.  However, the Connecticut Supreme Court has held that the "[mutuality] rule will no longer operate automatically to bar the use

allow the Sullivans to relitigate those issues in this case. The import of this conclusion is that the vast majority of the Sullivans' claims are precluded by Judge dos Santos's factual findings. There are, nevertheless, multiple reasons for why the Defendants are entitled to summary judgment on the majority of the Sullivans' claims, as the Court discusses more fully below.

### III. Section 1983 Claims Against the Municipal Defendants

The Sullivans' claims against the Municipal Defendants arise from two incidents, each of which will be discussed below: (1) the participation of Chief Whalen and Officers Williams and Devine in an alleged constructive eviction of the Sullivans from the Valley View residence on July 11, 2000; and (2) the investigation by Officers Devine and Hebert into Mr. Sullivan's report that his bulldozer was stolen from the Valley View residence on September 7, 2000.

### A. Claims Arising From July 11, 2000 Incident

According to the Sullivans, the basis for their claims arising from the July 11 incident is their "contention that the defendants did not 'protect' them from [Mr. Sullivan's relatives,] Maryanne Delisa, Thomas Delisa and Kathryn Hyland by failing to remove the Delisas and Hyland from [the Valley View residence] or arrest them" on July 11, 2000. Local Rule 56(a)1 Statement [doc. # 299] para. 22. Furthermore, notwithstanding Judge dos Santos's factual findings as to their status after July 7, 2000, the Sullivans still maintain that they were tenants of Ms. Crowell and that they have remained in lawful possession of the Valley View residence up to this very day. Thus, the Sullivans maintain that Chief Whalen and Officers Williams and Devine took part in the unlawful eviction of

---

of collateral estoppel," *Labbe v. Hartford Pension Comm'n*, 239 Conn. 168, 186 (1996) (alteration in original)). Instead, the Connecticut Supreme Court looks to the factors enumerated in Section 29 of the Restatement (Second) of Judgments in deciding whether to require mutuality of parties. None of the factors that would require mutuality applies in this case.

the Sullivans by their relatives on July 11, 2000, when the officers failed to remove the Sullivans' family members from what the Sullivans claim is *their* Valley View residence. These actions purportedly violated the Sullivans' equal protection and due process rights under the Fourteenth Amendment, as well as their Fourth Amendment rights, because they were allegedly deprived of their property interests and of the quiet enjoyment of the Valley View residence that they claim is guaranteed to them by the Fourteenth Amendment[8] to the U.S. Constitution and Connecticut General Statutes §§ 47a-16,[9] 47a-23,[10] 47a-43,[11] and 53a-108.[12] The actions allegedly giving rise to these claims also purportedly made the Sullivans more vulnerable to the later actions of the State

---

[8] Plaintiffs' Opposition [doc. # 317] appears also to allege that Chief Whalen and Officers Williams and Devine violated their Fifth Amendment rights on July 11, 2000. To the extent the Sullivans intend to assert such claims, the Court finds that they are beyond the scope of the Court's Ruling and Order [doc. # 247]. Therefore, the Court dismisses these claims, as they are not properly before the Court.

[9] A "landlord shall not abuse the right of entry or use such right of entry to harass the tenant" and "may not enter the dwelling unit without the consent of the tenant except (1) in case of emergency, . . . (3) pursuant to a court order, or (4) if the tenant has abandoned . . . the premises."

[10] "When the owner . . . or the owner's . . . legal representative . . . desires to obtain possession . . . of any . . . dwelling unit, . . . and (1) when a rental agreement . . . terminates . . . or . . . (3) when one originally had the right or privilege to occupy such premises but such right or privilege has terminated; . . . such [individual] . . . shall give notice to each lessee or occupant to quit possession or occupancy of such . . . dwelling unit . . . ."

[11] "When any person (1) makes forcible entry into any . . . dwelling unit and with a strong hand detains the same, or (2) having made a peaceable entry, without the consent of the actual possessor, holds and detains the same with force and strong hand, or (3) enters into any land . . . or dwelling unit and causes . . . removal of or detention of the personal property of the possessor, or (4) when the party put out of possession would be required to cause damage to the premises or commit a breach of the peace in order to regain possession, the party thus ejected . . . may exhibit his complaint to any judge of the Superior Court."

[12] "A person is guilty of criminal trespass in the second degree when, knowing that such person is not licensed or privileged to do so, . . . such person enters or remains in a building . . . ."

Defendants by enhancing the confidence of Mr. Sullivan's relatives and spurring them to further abuse the Sullivans. Thus, the Sullivans also assert that the Municipal Defendants are responsible for any subsequent harm the couple sustained.

### 1.    Equal Protection Claim

In asserting their equal protection claim, the Sullivans do not allege and have not demonstrated that they belong to a protected class and were denied equal protection on that basis. Rather, the Sullivans appear to assert a class-of-one equal protection claim under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). The Sullivans argue that Municipal Defendants refused to remove the Sullivan relatives–whom they paint as the agents of their landlord, Ms. Crowell–from the Valley View residence, but granted a similar remedy to another unknown and unidentified tenant in the Town of Farmington. *See* Local Rule 56(a)1 Statement [doc. # 299] Ex. B at 60-62. Mr. Sullivan alleges that he was told about this incident involving the unidentified tenant by Mr. Delisa, who allegedly locked out this tenant, only to be rebuffed and ordered to restore the tenant by unnamed Farmington police officers. *See id.* at 61-62.

For their *Olech* claim to withstand summary judgment, the Sullivans must produce evidence from which a reasonable jury could conclude that Chief Whalen and Officers Williams and Devine intentionally treated the Sullivans differently in comparison to other similarly-situated individuals and that the differential treatment was irrational and wholly arbitrary. *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 158-160 (2d Cir. 2006) ("[P]laintiffs state an equal protection claim where they allege that they were intentionally treated differently from other similarly-situated individuals without any rational basis."); *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005) ("In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they

compare themselves must be extremely high."); *see also Blackhawk Sec., Inc. v. Town of Hamden*, No. 3:03CV2101 (MRK), 2005 WL 1719918, at *4 (D. Conn. July 20, 2005) ("[A]n *Olech* plaintiff must establish [that] (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to the degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." (internal quotation marks omitted)).

There is no evidence, let alone admissible evidence, to support a jury finding for the Sullivans on their *Olech* equal protection claim. First, Judge dos Santos found as a fact that on July 11, 2000, the Sullivans were not tenants of Ms. Crowell, and, indeed had never been tenants. Therefore, even assuming that there were admissible evidence regarding the supposedly better-treated individual to whom the Sullivans seek to compare themselves (and there is no such admissible evidence), the Sullivans are not "prima facie identical" to that individual, as is required by the Second Circuit. *See Neilson*, 409 F.3d at 105 ("The similarity and equal protection inquiries are thus virtually one and the same in such a 'class of one' case, and the standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are 'prima facie identical.'"); *Blackhawk Sec., Inc.*, 2005 WL 1719918, at *5 ("[T]he relevant question is whether flaggers and uniformed police officers are so similar that no rational person could regard their differential treatment as justified on the basis of a legitimate governmental policy.").

Second, the Sullivans do not even allege, let alone offer any evidence, that any of the Municipal Defendants before this Court were involved in the incident with the unidentified tenant in Farmington that Mr. Sullivan describes. Simply put, the Sullivans have presented no evidence

that Chief Whalen and Officers Williams and Devine treated any other similarly-situated individual differently from the Sullivans. Therefore, the Court GRANTS the Municipal Defendants' Motion for Summary Judgment [doc. # 297] as to Plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment.

## 2.      Fourth Amendment and Fourteenth Amendment Due Process Claims

"To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'" *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (alteration in original)). "An official acts under color of state law for Section 1983 purposes when the official exercises a power possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117-18 (2d Cir. 2002) (internal quotation marks omitted). "The Fourth Amendment, which applies to the states through the Fourteenth Amendment, prohibits 'unreasonable . . . seizures,'" *Bryant v. City of N.Y.*, 404 F.3d 128, 136 (2d Cir. 2005) (citing U.S. Const. amend IV) (alteration in original and internal citation omitted), and the relevant test "is one of objective reasonableness," *id.* (internal quotation marks omitted). "A seizure of property . . . occurs when there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County, Illinois*, 506 U.S. 56, 61 (1992) (internal quotation marks omitted).

To succeed on a Fourteenth Amendment substantive due process claim,[13] the Sullivans must

---

[13] "Because the complaint does not allege any set of facts indicating a deprivation of procedural due process, it is assumed that the claim is based on the [Sullivans'] substantive due process rights." *Ferran v. Town of Nassau*, 471 F.3d 363, 369 (2d Cir. 2006).

demonstrate "(1) that [they] had a valid property interest . . . , and (2) that the defendants infringed

that property interest in an arbitrary or irrational manner." *Clubside, Inc.*, 468 F.3d at 152 (internal

quotation marks omitted). However, the Second Circuit has "said that a substantive due process

claim requires more: To trigger liability, a police officer's action must 'shock[] the conscience.'"

*Russo v. City of Bridgeport*, 479 F.3d 196, 209-10 (2d Cir. 2007) (quoting *County of Sacramento*

*v. Lewis*, 523 U.S. 833, 846 (1998) (alteration in original)). "That is, it must be 'arbitrary in the

constitutional sense.'" *Id.* (quoting *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (internal

quotation marks omitted)).

Thus, both the Fourth and Fourteenth Amendment claims require the Sullivans to

demonstrate that they had a protectable property interest. The Sullivans appear to claim that they

had a such an interest in the security and quiet enjoyment of the Valley View residence and that

Municipal Defendants denied them those rights either by cooperating with Mr. Sullivan's relatives

in the Sullivans' constructive eviction from the Valley View residence on July 11, 2000, or by failing

to remove the Sullivans' relatives from the residence. Whether analyzed under the Fourth

Amendment or Fourteenth Amendment,[14] the Sullivans' due process claim has no merit for several

reasons.

To begin with, the Court has considerable doubt that the Sullivans had any protectable

property interest in the Valley View residence. After all, Judge dos Santos ruled that the Sullivans

---

[14] Second Circuit case law has clarified that the proper framework for analyzing claims such as those asserted by the Sullivans regarding the July 11 incident is the Fourth Amendment, rather than the Fourteenth Amendment. *See Bryant*, 404 F.3d at 136 ("'Substantive due process analysis is . . . inappropriate . . . [where a] claim is 'covered by' the Fourth Amendment.'" (citation omitted and alteration in original)); *Soldal*, 506 U.S. at 61 (ruling that the Fourth Amendment protects against government seizures of the home).

were at no time Ms. Crowell's tenants at the Valley View residence, that they did not hold possession of the premises on July 11, 2000, and that they had abandoned the property by that time. *See* Housing Decision at 11-12. Accordingly, the Sullivans appear to have lacked even a possessory interest in the residence as of July 11, only further undermining their Fourth Amendment and Fourteenth Amendment claims. *See Soldal*, 506 U.S. at 61 ("A seizure of property . . . occurs when there is some meaningful interference with an individual's *possessory* interests in that property." (emphasis added and internal quotation marks omitted); *Ostensen v. Suffolk County*, 378 F. Supp. 2d 140, 148 (E.D.N.Y. 2005) ("Without being able to establish that she had possessory interest in the house, the Plaintiff cannot successfully maintain an unreasonable seizure claim."), *aff'd*, No. 05-4456 CV, 2007 WL 1492856 (2d Cir. May 23, 2007); *Ansell v. D'Alesio*, No. 3:05CV438 (MRK), 2007 WL 1229088, at *5 (D. Conn. Apr. 25, 2007) ("'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks omitted))).

Second, and in any event, the Sullivans have produced no evidence that it was the Municipal Defendants' actions that deprived the Sullivans of any alleged property interest. Importantly, the Sullivans do not claim that the Municipal Defendants themselves physically removed the Sullivans or ejected them from the Valley View premises. *See, e.g.*, Pls.' Local Rule 56(a)2 Statement [doc. # 318] para. 19. To the contrary, it is clear from the record that all the police did was inform the Sullivans that they would have to proceed through the civil courts in order to establish their claim to the Valley View residence. The officers' mere presence at the scene of this family dispute does not constitute state action sufficient to trigger either Fourth or Fourteenth Amendment protection.

See, e.g., *Barrett v. Harwood*, 189 F.3d 297, 302 (2d Cir. 1999) (discussing the issue of when "an officer's presence and activities at the scene of a repossession become state action"); *Sullivan v. Stein*, 2004 WL 1179351, at \*35 ("[W]hen analyzing allegations of state action, the court must begin 'by identifying the specific conduct of which the plaintiff complains.'" (quoting *Szekeres v. Schaeffer*, 304 F. Supp. 2d 296, 306 (D. Conn. 2003) (internal quotation marks omitted))).

In *Harwood*, for example, the plaintiffs alleged that a police officer "had a duty to advise [the repossessor] to cease repossessing their truck and to proceed through legal action. According to the [plaintiffs], Officer Durant aided in the unlawful repossession through his conduct and threat of arrest." 189 F.3d at 300-01. For instead of complying with the plaintiffs' request, the police officer "informed the [plaintiffs] that the repossession was a civil matter in which he could not get involved." *Id.* at 303. In rejecting the plaintiffs' claim, the Second Circuit first looked to other courts' decisions on the "spectrum of police involvement at the scene of a repossession." *Id.* at 302. As the court explained, "[a]t one end of the spectrum is de minimus police involvement . . . . [such as] *a police officer's mere presence at the scene[, which] is insufficient to constitute state action.*" *Id.* (emphasis added). The Second Circuit stated that, in deciding whether the actions of police officers at the scene of a repossession rise to the level of state action,

> the crucial question is whether the police officer was (1) present simply to stand by in case there was a breach of the peace, or (2) taking an active role that either affirmatively assisted in the repossession over the debtor's objection or intentionally intimidated the debtor so as to prevent him from exercising his legal right to object to the repossession.

*Id.* at 302-03. In answering that critical question, the Second Circuit held that the police officer's actions "amounted to no more than the carrying out of his duty to prevent violence in the event of a breach of the peace and that there was no state action to facilitate the repossession." *Id.* at 303; *see*

*also id.* at 302 (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 510-12 (5th Cir. 1980) (no state action where police officers informed the plaintiff that "'repossession was a civil matter,'" even though plaintiff claimed that one officer threatened to arrest him)).

Here, the facts are even less favorable for the Sullivans than they were for the plaintiffs in *Harwood*. For there was no attempt by the police to remove the Sullivans from the premises and no threat of arrest if the Sullivans did not leave. Rather, the Municipal Defendants–faced with a family dispute–wisely and properly informed the Sullivans that they would need to proceed through the civil courts to resolve their property claim. While the Sullivans argue that the Municipal Defendants should have removed the Sullivans' relatives from the Valley View residence or arrested them, the police "have no responsibility to clarify property rights, are not trained to do so, and follow a standard procedure of telling disputing property owners to seek a civil remedy because they seldom know when called to a property dispute who the real owners are" or "the precise nature of their rights." *Longmoor v. Nilsen*, 329 F. Supp. 2d 289, 302 (D. Conn. 2004).

The Sullivans principally rely on the Supreme Court's decision in *Soldal* in support of their claim that the Municipal Defendants' actions deprived them of their alleged interest in the Valley View residence. *See* 506 U.S. 56. In *Soldal*, a tenant sued his landlord, a mobile home park owner, the park manager, five deputy sheriffs, and a deputy lieutenant for violations of the Fourth and Fourteenth Amendments caused by the removal of the tenant's mobile home from the mobile home park without a valid eviction order. The private defendants in that case called the local sheriffs to keep the peace while the mobile home was dismantled and physically removed from the park. The deputy sheriffs informed the tenant that they would prevent him from interfering with the removal. And a deputy lieutenant declined to accept a complaint of criminal trespass from the tenant because

the removal was a civil matter between the tenant and the park owner. The Supreme Court held that the officers' involvement in the forcible removal of the mobile home constituted a "seizure" within the meaning of the Fourth Amendment.

*Soldal* is distinguishable from the present case in several salient ways. For one, Soldal had a valid tenancy and an indisputable possessory interest in his home. For another, the officers in *Soldal* knew that the private defendants did not have an eviction order and that their actions in removing the home were illegal, and the officers had known this for some period of time before the actual date of removal. *See id.* at 58-59. In this case, by contrast, there is no evidence that Chief Whalen or Officers Williams and Devine had any knowledge of the dispute between the Sullivans and their relatives before July 11, 2000; nor do the Sullivans allege that any conspiracy to deprive them of their rights began before the police arrived on that date. Also, the officers in *Soldal* were called by the re-possessors to assist them in the repossession. Here, by contrast, the Sullivans themselves called the police in order to have the Municipal Defendants forcibly remove Mr. Sullivan's relatives from the property. *See Ostensen*, 378 F. Supp. 2d at 147 (finding no state action in part because the police officer responded to calls from both the party alleging the deprivation and the alleged dispossessor).

Finally, the Seventh Circuit, in ruling on Soldal's initial appeal, had determined that "because the police prevented Soldal from using reasonable force to protect his home from private action that the officers knew was illegal, there was sufficient evidence of a conspiracy between the private parties and the officers." *Soldal*, 506 U.S. at 60 n.6. To sustain a claim of civil conspiracy to violate their civil rights under § 1983, "the plaintiff[s] must allege facts showing an agreement or meeting of the minds between the state actor and private actor to engage in a conspiracy to deprive the

plaintiff of a constitutional right." *Simpson v. Denardo*, No. 3:02CV1471(MRK), 2004 WL 1737444, at *5 (D. Conn. July 29, 2004). The Sullivans have not satisfied that standard. While the Sullivans baldly assert that the Municipal Defendants conspired with Mr. Sullivan's relatives to constructively evict them from the premises, that claim is solely based on the Sullivans' allegation that the Municipal Defendants "didn't do their job. They didn't do what their duty is, and that's to protect citizens." *See* Pls.' Mem. In Opp'n to Municipal Defs. [doc. # 317] Ex. D at 85. There is no evidence in this case of any agreement or plan between the Municipal Defendants and Mr. Sullivan's relatives. And there is no evidence that the police directed the Sullivans to leave or attempted in any way to impede the Sullivans from protecting themselves or the Valley View residence.

Therefore, even taking the facts in the light most favorable to the Sullivans, the Court concludes that there is no evidence that any state actor deprived the Sullivans of any property right on July 11, 2000, or "constructively evicted" them from the Valley View residence on July 11, as they claim. In *Soldal*, for example, the defendants, allegedly "acting under color of state law, dispossessed the Soldals of their trailer home by physically tearing it from its foundation and towing it to another lot." *Soldal*, 506 U.S. at 72. Accordingly, the Supreme Court noted, "this was no 'garden-variety' landlord-tenant . . . dispute." *Id.* Here, the record shows that the Sullivans left the Valley View residence of their own accord on July 11, just as they had on July 6 and July 7. While the Sullivans assert quite vociferously that they did not leave willingly, but rather were forced from the premises by the aggression of their relatives, the record shows that their relatives did nothing more than sit on the porch of the house, while refusing to leave and arguing with the Sullivans.

Those actions are a world away from the physically destructive actions of the defendants in *Soldal*.[15]

Because the Municipal Defendants did not restrain the Sullivans from protecting themselves or their property, or indeed, take any affirmative act, there was no Fourth or Fourteenth Amendment violation on July 11, 2000.[16]   Furthermore, because the Sullivans have not demonstrated that Chief Whalen and Officers Williams and Devine acted improperly on July 11, these Defendants also cannot be held responsible for any harm later allegedly sustained by the Sullivans as a result of their family members' actions.

## B. Claims Arising From September 7, 2000 Incident

The Sullivans claim that Officers Devine and Hebert effectively stole Mr. Sullivan's bulldozer on September 7, 2000, by failing to take any action after they learned that Mr. Sullivan's

---

[15]   Insofar as the Sullivans assert a violation of substantive due process distinct from their Fourth Amendment claims, the Second Circuit has taught, "[o]nly an affirmative act can amount to a violation of substantive due process, because the Due Process Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Lombardi v. Whitman*, No. 06-1077-cv, 2007 WL 1148709, at *5 (2d Cir. April 19, 2007) (internal quotation marks omitted); *see also Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."). The Second Circuit in *Lombardi* went on to state that "[i]t is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm." *Lombardi*, 2007 WL 1148709, at *5. "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the deprivation of liberty triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Deshaney*, 489 U.S. at 200 (internal quotation marks omitted); *see also Lombardi*, 2007 WL 1148709, at *6 ("Where a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages."). The Sullivans have failed to show any such affirmative act on the part of the Municipal Defendants.

[16] The Sullivans also bring a federal due process claim to remedy several alleged violations of Connecticut statutes, but they fail to explain how violation of a state statute would give rise to a federal cause of action.  Even if it could, the Sullivans have also failed to demonstrate that any of the cited statutes were actually violated by the Municipal Defendants.

brother-in-law, Thomas Delisa, was responsible for removing the bulldozer from the property and selling it. They also allege that these Municipal Defendants: (1) falsified the police incident report by stating in it that the Sullivans had abandoned the Valley View residence and were in the middle of "longstanding litigation" with the Sullivans' family members; (2) should have known that Mr. Sullivan was voicing a complaint for unlawful eviction and should have taken action on the complaint; and (3) failed to protect the Sullivans from their relatives, which later emboldened their relatives to plant evidence and frame Mr. Sullivan for eavesdropping, thereby enabling the State Defendants to violate the Sullivans' rights. *See* Second Am. Civil Rights Compl. [doc. # 251] at 19-20.

Much of what the Court has already said regarding the July 11 incident applies with equal force to the Sullivans' allegations regarding the September 7 incident. Once again, as with the July 11 incident, Judge dos Santos's findings in the state court action undermine the Sullivans' claims arising from the September 7 incident. Thus, Judge dos Santos found as a fact that Mr. Delisa, who removed the bulldozer from the property at Ms. Crowell's direction and arranged for it to be sold, did not steal the bulldozer. *See* Housing Decision at 15. As Judge dos Santos stated, "[t]he Court finds that the plaintiffs had ample opportunity to remove the bulldozer . . . from the property, but admitted that they had no intention of removing [it] from the property . . . . Consequently, the plaintiffs have failed to prove by 'clear and convincing evidence' that their personal belongings were stolen by the defendants." *Id.* Judge dos Santos also found that no eviction had occurred, *see id.* at 11-12, and therefore the Sullivans were not deprived of any property rights by the Municipal Defendants' failure to intuit and act upon Mr. Sullivan's non-existent eviction complaint.

More important, as with the July 11 incident, the Municipal Defendants did not "effectively

steal" Mr. Sullivans' bulldozer or take any affirmative action to deprive Mr. Sullivan of his property. Indeed, that is the essence of the Sullivans' complaint against the Municipal Defendants–that they did not act. Yet, as discussed above, in the context of this case, the officers' failure to act on the Sullivans' complaints cannot be transformed into state action violative of the Sullivans' Fourth and Fourteenth Amendment rights.[17] *See, e.g.*, *Lombardi*, 2007 WL 1148709, at *5.

In summary, the Court concludes that there are no genuine issues of material fact regarding the Sullivans' claims against the Municipal Defendants arising from either the July 11 or September 7 incidents and that the Municipal Defendants are entitled to summary judgment on the Sullivans' § 1983 claims. The Sullivans also maintain that the Town of Farmington is responsible for the individual Municipal Defendants' violations of the Sullivans' constitutional rights. *See Smith v. Edwards*, 175 F.3d 99, 107 (2d Cir. 1999) ("Under 42 U.S.C. § 1983, a municipality may be held liable for a constitutional violation if the plaintiff can prove that the violations resulted from a municipality's customs or policies.") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Because the Sullivans have failed to demonstrate that they suffered a constitutional violation at the hands of the individual Municipal Defendants, the Town of Farmington is also entitled to summary judgment on the Sullivans' § 1983 claims. *See Justin F. v. Maloney*, 476 F. Supp. 2d 141, 158 (D. Conn. 2007); *see also Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 132 (2d Cir. 1997) (citing

---

[17] Because Officers Hebert and Devine are not federal actors, the Court has construed the Sullivans' Fifth Amendment claim as a Fourteenth Amendment Claim. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law." (internal quotation marks omitted)); *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006) ("Bussey's due process claims are against state, not federal, actors, and thus the Fourteenth Amendment, rather than the Fifth Amendment, applies to these claims.").

*City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)).

## IV. Section 1983 Claims Against the State Defendants

The Sullivans contend that on four separate occasions–September 29, 2000, January 22, 2001, January 25, 2001 and April 20, 2001–Inspector Zigmont unlawfully entered the Valley View residence. The Sullivans sue Inspector Coffey because he accompanied Inspector Zigmont on the first alleged unlawful entry and supervised Inspector Zigmont's activities throughout this period. The Sullivans claim that during the course of the entries, Inspector Zigmont allegedly conducted unlawful searches of the Valley View residence and unlawful seizures of the Sullivans' property, including several tape recordings in which Mr. Sullivan expressed criticism of Connecticut politicians and government employees. Suing under § 1983, the Sullivans contend that the State Defendants' actions violated their rights under the First, Fourth, Fifth, and Fourteenth Amendments. *See* Second Am. Civil Rights Compl. [doc. # 251] at 20-36.[18]

### A. Entries on September 29, 2000 and January 22, 2001

The Sullivans allege that Inspectors Zigmont and Coffey first unlawfully entered, searched, and seized items from the Valley View residence on September 29, 2000, when they met with Ms. Crowell's son-in-law, James Hyland, to discuss Ms. Crowell's criminal complaint against Mr. Sullivan. The principal injury that Plaintiffs claim to have sustained from the State Defendants

_____

[18] While much of the Sullivans' briefing is concerned with the allegedly unlawful prosecution of Mr. Sullivan that resulted from the evidence Inspector Zigmont collected during the course of his allegedly unlawful searches and seizures, the Sullivans expressly denied in their Plaintiffs' Objection to States' Renewed Motion to Dismiss [doc. # 228] that they are asserting any claim of malicious prosecution. *See id.* at 5. Furthermore, the Sullivans did not request permission to add a malicious prosecution claim when they sought to amend their complaint for the fourth time. *See* Ruling and Order [doc. # 246] at 3 n.1. Because the Sullivans have not asserted a malicious prosecution claim and have expressly disclaimed any interest in doing so, the Court will not address malicious prosecution as an independent basis for recovery.

33

actions on these dates arises from the Inspectors' entries onto the property itself, and not from the seizure of the Sullivans' property.

The Sullivans assert that, because the Inspectors entered onto the Valley View property on September 29 without a warrant and because neither the Inspectors nor Mr. Hyland had the Sullivans' permission to be on the property on that date, the Inspectors' entry and subsequent search of the premises violated the Sullivans' rights under the Fourth Amendment. The Sullivans also allege that Inspector Zigmont unlawfully searched the home when he looked into the den window from outside the Valley View residence on January 22, 2001. Each of the Sullivans' claims is without merit.

"The Fourth Amendment protects the right of private persons to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006) (internal quotation marks omitted); *see* U.S. Const. amend IV. The Second Circuit has taught that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" *Cassidy v. Chertoff*, 471 F.3d 67, 76 (2d Cir. 2006) (quoting *Vernonia Sch. Dist. 47j v. Acton*, 515 U.S. 646, 654 (1995) (alteration in original)). "To prove an illegal search claim, a party must demonstrate (1) that he had an expectation of privacy that society is prepared to consider reasonable and (2) that he had acted in a way with respect to the property in question that indicated a subjective expectation of privacy." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 181-82 (2d Cir. 2004); *see United States v. Paulino*, 850 F.2d 93, 97 (2d Cir. 1988) ("First, the person challenging the search must demonstrate a subjective desire to keep his or her effects private; and, second, the individual's subjective expectation must be one that society accepts as reasonable."). "[W]hen a person voluntarily abandons property . . . he forfeits any reasonable expectation of privacy that he

might have had in the property." *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990). "Thus, even in the absence of a warrant and probable cause, a search of property that has been abandoned . . . does not violate a privacy interest." *Gudema v. Nassau County*, 163 F.3d 717, 722 (2d Cir. 1998).

Focusing first on the Inspectors' entries onto the Valley View property and into the residence itself, the Court has little difficulty concluding that the Sullivans' claims of illegal entry have no merit. First, as noted earlier in the discussion of Sullivans' claims against the Municipal Defendants, the Sullivans are collaterally estopped by Judge dos Santos' finding that they had abandoned the Valley View residence at least as of July 7, 2000. Because the Sullivans had abandoned the Valley View residence as of July 7, they no longer had any legitimate privacy interest in the premises that they had abandoned. *See id.*

Second, wholly aside from Judge dos Santos's factual finding of abandonment, the Court concludes on the basis of the undisputed facts in the record that on September 29, 2000 and January 22, 2001, the Sullivans did not "have a legitimate expectation of privacy" in the Valley View residence itself. *Snype*, 441 F.3d at 130. The Sullivans were on notice that Mr. Sullivan's mother–owner of the Valley View residence–was planning to sell the property as early as June 27, 2000. Yet, Mr. Sullivan refused to purchase the property, and he and his wife fled the premises on July 6, 7, and 11, 2000 when his relatives arrived on the scene. Even after Chief Whalen informed Mr. Sullivan that he would need to work out his issues with his family in civil court, the Sullivans did not contact an attorney until after they learned that the locks to the residence had been changed, over two months after their initial conflict with their family members. At no point in time after July 6 did Mr. Sullivan and his wife actually stay overnight at the Valley View residence, and

indeed, they signed a lease on an apartment in Newington, Connecticut on August 1, 2000. Even after receiving numerous telephone calls from their relatives and demands from Ms. Crowell and her attorney to vacate the premises, as well as warnings that the locks would be changed, the Sullivans still took no steps whatsoever to secure possession of the Valley View residence. In fact, the Sullivans did not file their entry and detainer action until almost two weeks after they realized they had been locked out. Therefore, even if the Sullivans had a subjective desire to retain an interest in the Valley View residence, any such subjective expectation would have been objectively unreasonable. *See Gudema*, 163 F.3d at 722 (holding that, to retain a reasonable expectation of privacy, an individual must "vigilantly protect[] the right to exclude others").

Third, and finally, Mr. Hyland gave the Inspectors his consent to enter onto the premises and into the residence, and they reasonably relied on that consent. Mr. Hyland was the husband of the actual co-owner of the property, a fact Mr. Sullivan admitted in his deposition. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 4 at 94. Mr. Hyland also represented to the officers that he had the consent of the complainant, Ms. Crowell, whom he said was the owner and recent co-occupant of the premises. Ms. Crowell had lived in the Valley View residence as of the first week of July, and while she did not retain actual ownership of the premises on September 29, 2000, her daughters, who had obtained the property by quitclaim deed, did.[19] Mr. Hyland also had the key to the premises and exerted apparent control over them.

---

[19] *See Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 61 (2d Cir. 2003) ("Plaintiff's argument fails utterly to identify a *clearly-established* right to be free from a warrantless search of her home authorized by the conservator of her father's estate. The landlord-tenant analogy is inapposite, as neither her father (Mr. Ehrlich) nor Mr. Roberto operated as Ms. Ehrlich's landlord, or anything like it. Mr. Ehrlich had been a co-*habitant* in the home until three weeks prior to the incident, and retained ownership of the premises." (emphasis in original and footnote omitted)).

Finally, Mr. Hyland told the Inspectors that the Sullivans had abandoned the property and their possessions, and it is undisputed that, when Inspectors Zigmont and Coffey arrived at the Valley View residence on September 29, 2000, the Sullivans' relatives had already moved the bulk of the Sullivans' personal property into the den and the garage. Even the private investigator Mr. Sullivan hired reported that on September 11, 2000, "it was obvious that no one was living" at the Valley View residence. *See* Pls.' List of Filings [doc. # 353] Ex. 36 at 2. Therefore, Inspectors Zigmont and Coffey reasonably believed that the premises were unoccupied and that Mr. Hyland had common authority over the premises and could consent to their entry upon those premises. *See Illinois v. Rodriguez*, 497 U.S. 177 (1990) (holding that when a person does not have the authority to give valid consent to a search, a search will nevertheless be upheld if the officer reasonably (even if incorrectly) believed that the third party had common authority over the premises to be searched); *United States v. Elliott*, 50 F.3d 180, 186 (2d Cir. 1995) ("Under *Rodriguez v. Illinois*, even if the third party did not have the requisite relationship to the premises, and therefore lacked the authority to give a valid consent, official reliance on his consent may validate the search if it was reasonable for the officers to believe he had the requisite relationship."); *cf. Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 1527 (2006) ("For the very reason that *Rodriguez* held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received.").

Turning next to the Sullivans' claims regarding allegedly unlawful seizures of their

possessions from the Valley View premises, as the Court noted in its denial of the State Defendants' Motion to Dismiss [doc. # 223], "while Judge dos Santos decided the issue of whether Plaintiffs had a possessory interest in the premises itself . . . he did not determine whether Plaintiffs retained a legitimate expectation of privacy in their personal property that remained locked in Ms. Crowell's house and garage." *See Sullivan v. Stein*, 2005 WL 2209301, at *3. However, it is undisputed that no property was seized by Inspector Zigmont on January 22, 2001, and the only property "seized" by the State Defendants on September 28, 2000 was three tapes given to them by Mr. Hyland. *See* Pls.' List of Filings [doc. # 353] Ex. 9. Plaintiffs have steadfastly denied that these tapes belong to them or were made by them. *See, e.g.*, Pls.' List of Filings [doc. # 353] Ex. 1B paras. 67, 85. Therefore, the Sullivans cannot assert that they had any legitimate expectation of privacy in the audiotapes or any basis on which to challenge the Inspector's accepting of them from Mr.Hyland. *See, e.g.*, *Lee*, 916 F.2d at 818 (holding that the defendant's repeated statements disavowing ownership of suitcase constituted abandonment, thereby forfeiting any legitimate expectation of privacy).[20]

Moreover, as noted previously, Mr. Hyland told the State Defendants that the Sullivans had abandoned the premises and he represented that he had the authority to consent to a search of the premises. Mr. Hyland also represented that the Sullivans had abandoned the audiotapes that he gave

---

[20] The Sullivans counter that they had obtained an injunction from the Housing Court regarding their possessions and that this injunction gave them a reasonable expectation of privacy in the possessions that they had left at the Valley View residence. *See* Plaintiffs' Revised, Amended Memorandum of Law in Opposition to State Defendants' Motion for Summary Judgment [doc. # 349] at 38 ("Pls.' Am. Mem. in Opp'n to State Defendants"); Pls.' List of Filings [doc. # 353] Ex. 5. However, because, according to the Sullivans themselves, these tapes were not their property, and because the injunction only dealt with the Sullivans' possessions, the injunction could not provide any expectation of privacy in the audiotapes.

to the Inspectors, and the Inspectors had no reason to disbelieve him, in light of the multitude of the Sullivans' possessions remaining on the premises.[21]  Therefore, because on September 29, 2000 and January 22, 2001, the Sullivans did not retain a reasonable expectation of privacy in the Valley View residence, because none of their property was seized (or, if they did own the three audiotapes, the Sullivans have given up any right to contest their seizure), and because, even if the Sullivans did retain an interest in the Valley View residence, Inspectors Zigmont and Coffey reasonably relied on the authority of Mr. Hyland, the Sullivans cannot now contest the propriety of the State Defendants' actions on those dates.

## B.  Searches and Seizures on January 25, 2001 and April 20, 2001

The Sullivans make several arguments why the searches and seizures Inspector Zigmont conducted pursuant to two search warrants on January 25, 2001 and April 20, 2001 were unlawful. Unlike the seizure on September 29, 2000, the Sullivans do specifically claim that they owned several of the items seized by Inspector Zigmont on January 25 and April 20.  On January 25, Inspector Zigmont seized a "[p]lastic storage drawer containing telephone equipment . . . [a] [p]lastic box containing eleven cassette tapes . . . [t]wo cassette tapes . . . [two] Maxell UR cassette tape box[es, each] containing ten cassette tapes . . . [and] [t]wo black colored telephone switching devices with attached headset," *see* Pls.' List of Filings [doc. # 353] Ex. 28 at 2.  On April 20, he seized a "[p]lastic folio . . . containing: . . . [o]ne invoice for a video and catalog from Spy Shop LTD to Philip Sullivan. . . .  One yellow catalog for intelligence gathering and countermeasure equipment from the USI Corporation. . . .  One 'CCS SURVIVAL CATALOG' for surveillance and security

---

[21] There is no evidence that the Inspectors were aware that the Housing Court had issued an injunction preventing the Sullivans' relatives from disposing of their property, and so this fact does not diminish the Inspectors' reasonable reliance on the authority of Mr. Hyland.

products. . . . One CCS video catalog for surveillance and security products [and a]ssorted other paperwork," and two cassette tapes labeled "P.S.-K.HYL. Re T.B....S" and "M-C. P.S.-D.M.M. estate 5/23/91." *See id.* Ex. 61. The Sullivans' principal argument regarding these searches and seizures is that Inspector Zigmont made several misrepresentations and failed to include several relevant facts in his warrant applications for both the January and April warrants, and that these actions provide a basis to invalidate the warrants and render the searches unlawful.[22]

"'There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant.'" *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978) (alteration in original)). While "a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden," *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (emphasis added), the Sullivans may carry their burden if they can demonstrate that Inspector Zigmont "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, . . . [where] such false or omitted information was necessary to the finding of probable cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (citations and internal quotation marks omitted). This determination

[22] They also assert that no warrant was issued for the April 20, 2001 search and seizure. But the Court is unclear of the basis for the Sullivans' assertion, since both the Sullivans and the State Defendants have included a copy of the search warrant application and signed search warrant within their moving papers. *See, e.g.*, Pls.' List of Filings [doc. # 353] Ex. 16. Moreover, Inspector Zigmont has confirmed in his Affidavit that "Judge Mullarkey agreed that probable cause existed and granted the warrant application on April 19, 2001." Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 75. As to the warrant issued for the January 25, 2001 search and seizure, the Sullivans argue that the warrant application was based upon observations made by Inspector Zigmont when he unlawfully searched the Valley View residence on January 22, 2001 by peering into the den window from the yard. However, the Court has just ruled above that Inspector Zigmont's search on January 22, 2001 was not unlawful, and therefore any observations gathered by him at that time were lawfully included in his January 23, 2001 warrant application.

is a mixed question of law and fact, and "implicates what, in [the Second Circuit], has come to be known as the 'corrected affidavits doctrine.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "[T]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Martin*, 426 F.3d at 74 (internal quotation marks omitted). The Court has very recently ruled on just such an issue in the context of an arrest warrant. *See Justin F.*, 476 F. Supp. 2d at 151-57.

The Sullivans allege that Inspector Zigmont included several false statements and neglected to include several exculpatory facts in his January 23, 2001 warrant application, and that these omissions were material to the Superior Court's finding of probable cause. According to the Sullivans, Inspector Zigmont omitted the following facts: (1) that he was standing outside the house on January 22, 2001, peering in; (2) that the Sullivans and their relatives were embroiled in a legal dispute over the Sullivans' rights to return to the Valley View residence, and that the Sullivans had been locked-out of their home; and (3) that one of the tapes given to Inspector Zigmont by Mr. Hyland on September 29, 2000, which Inspector Zigmont played for Ms. Crowell in his January 8, 2001 interview of her, revealed that Ms. Crowell taped her own phone calls and that her family members knew this. The Sullivans further claim that Inspector Zigmont included the following false statement in the warrant application: that the items he wished to seize were "*still* inside the . . . den . . . on the front window sill," Pls.' Am. Mem. in Opp'n to State Defs. [doc. # 349] at 48 (emphasis added), when Inspector Zigmont knew these items had not been in that location when he visited the house on September 29, 2000.

For several reasons, the Court rejects the Sullivans' attack on the January 23 warrant. First, the Sullivans' contention that Inspector Zigmont omitted from his application that the Sullivans were

embroiled in a housing conflict with their relatives is without merit. Inspector Zigmont did in fact state that "Hyland said that Sullivan has tried to block the sale of the house and that the housing matter is currently pending in housing court." Pls.' List of Filings [doc. # 353] Ex. 53 at 2. That Inspector Zigmont failed to specifically note that the Sullivans had been locked out is of no moment, because, as discussed above, they had not been "locked out" under state law.

Second, the Sullivans' contention that the tape Inspector Zigmont played for Ms. Crowell on January 8, 2001 revealed that she recorded her own phone calls–and that therefore his omission of this fact was material–is also meritless. The Sullivans base their allegation on a purported transcript of this recorded phone call that Mr. Sullivan himself transcribed when the tape was turned over to him during the course of his criminal prosecution. *See* Pls.' List of Filings [doc. # 353] Ex. 1B para. 1a. Even assuming that Mr. Sullivan's transcript is accurate and could be substituted at the time of trial with an admissible version of the same evidence, the transcript itself simply does not reveal what the Sullivans hope. The relevant portion of Mr. Sullivan's transcript follows:[23]

| MEC | Yeah |
|-----|------|
| MAD | bango |
| MEC | yeah yeah |
| MAD | That's what I would do . . . and then you don't . . . then it's done . . . you took care of it, and ya know *and then she calls you and should you monitor your calls,* she shouldn't and that's it !! |
| MEC | Yeah |
| MAD | That's what I would do I was just (unintelligible) the other I got home . . . I got home awhile ago and the minute I walk in the phone's ringing it's Kathy . . . . . |

Pls.' List of Filings [doc. # 353] Ex. 1A at 2 (alterations and emphasis in original). At most, this call seems to suggest Ms. Delisa advising her mother to monitor her calls, but gives no indication

---

[23]The acronyms MEC and MAD denote Ms. Crowell and her daughter, Ms. Delisa, respectively.

whatsoever that Ms. Crowell did so, or even that she was agreeing with Ms. Delisa on a preferred course of action. Certainly, even giving the Sullivans the benefit of all inferences, as the Court must, this transcript does not indicate that Mary Crowell taped her own phone calls or that either State Defendant or her relatives believed that she did. Therefore, the Sullivans were not entitled to the inclusion of that fact within the January 23, 2001 warrant application.

Third, the Court concludes that Inspector Zigmont's description of the materials he wished to seize, as well as their location within the Valley View residence, was neither false nor misleading. The Sullivans' quotation from the warrant application selects out portions of Inspector Zigmont's statement, thereby distorting it. Inspector Zigmont did not attempt to mislead the state court into believing that the Sullivans had left the audiotapes and alleged eavesdropping equipment in the front window sill of the living room. Rather, Inspector Zigmont clearly stated that he "observed that Sullivan's belongings, were still inside the garage and den. Specifically, two Maxell UR 90 cassette tape boxes containing cassette tapes were on the front window sill in the den. Additionally, a black electronic device with attached headphones was on the window sill next to the cassette tape boxes." Pls.' List of Filings [doc. # 353] Ex. 53 at 3. Inspector Zigmont does not indicate that the items were there when he last visited the house in September 2000. In fact, earlier in the application, he indicates that the black electronic device was still attached to the phone line, that the box of tapes was in the garage, and that Mr. Hyland had moved the tapes into the garage, not the Sullivans. *See id.* ("On September 29, 2000, Affiant One and Inspector Coffey observed the alterations to the phone wiring system, as well as numerous cassette tapes that had been moved into the garage by Hyland and identified by Hyland as Sullivan's.").

Finally, it is true that Inspector Zigmont omitted from his application that he was outside the

43

Valley View residence when he made his January 22 observations. However, the Court concludes that even adding that fact to the warrant application, a neutral judge would have ample basis for concluding that there was "a fair probability that . . . evidence of a crime [would] be found in a particular place," *Martin*, 426 F.3d at 74, namely, the Valley View residence.

The Sullivans' complaint about the propriety of the April 19 warrant application includes the same claims discussed above regarding the previous warrant application, *see* Pls.' Am. Mem. in Opp'n to State Defs. [doc. # 349] at 53. In addition, the Sullivans allege that Inspector Zigmont included a false statement–namely that "[o]n January 25, 2001, the affiant . . . executed a . . . warrant . . . . Several items of telephone equipment were seized, including . . . thirty three cassette tapes, some of which contained what **appeared to be** recorded telephone conversations between a male and a female," *id.* at 7 (emphasis in original). The Sullivans assert that none "of the cassettes contained recorded telephone conversations violative of Ct. Gen Statute 53a-189 and defendant knew it." *Id.* The Sullivans therefore do not contest the validity of the statement, but instead object to an inference the judge could have, but need not have, drawn from it. Because the Sullivans do not actually contest that Inspector Zigmont seized at least two tapes with "what appeared to be" conversations between a male and a female, Inspector Zigmont's statement was not false and that the Sullivans' objections to the warrant application are meritless. Thus, the searches and seizures that occurred on January 25, 2001 and April 20, 2001 were supported by probable cause, and no violation of the Sullivans' Fourth Amendment rights occurred.

### C. May 25, 2001 Arrest

The Sullivans' Second Amended Civil Rights Complaint [doc. # 251] can also be read to include a claim that Inspector Zigmont unlawfully seized Mr. Sullivan on May 25, 2001 pursuant

to an arrest warrant issued on less than probable cause. "'[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Jenkins v. City of N.Y.*, 478 F.3d 76, 84-85 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (alteration in original)). Federal courts evaluate probable cause in light of the totality of the circumstances. *Id.* at 90. Likewise, under Connecticut law, probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." *State v. Barton*, 219 Conn. 529, 548 (1991) (internal quotation marks omitted); *see also State v. Heinz*, 193 Conn. 612, 617 (1984) (defining probable cause as a standard "less demanding than that which attends an inquiry into whether there has been a prima facie showing of criminal activity. Instead, all that is required is that the affidavit, read in a common-sense manner, give objective evidence of a fair probability that proscribed activity has occurred." (citations omitted)).

In this case, Inspector Zigmont's application for an arrest warrant was reviewed by the State's Attorney's Office and approved by a Superior Court Judge. "An arrest pursuant to a warrant signed by a neutral judge or magistrate normally carries a presumption that it was made with probable cause." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 450 (D. Conn. 2002). However, the Sullivans again relate a laundry list of alleged omissions and false statements that Inspector Zigmont included in his arrest warrant application, and so the Court must again "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997) (quoting *Soares*, 8 F.3d at 920); *Justin F.*, 476 F. Supp. 2d at 151-53.

Mr. Sullivan lists fifteen facts supposedly omitted from the arrest warrant application, some of which have been addressed earlier in this opinion, and therefore the Court will not repeat that discussion.[24]  Having carefully considered the Sullivans' claims, the Court finds no merit to any of them.  For example, according to the Sullivans, Inspector Zigmont allegedly omitted the following facts:  that the Valley View garage was packed full of the Sullivans' possessions; that Mr. Hyland was not an occupant of the Valley View residence and that the Inspectors did not know whether he had the authority to consent to the search of the premises; and that Ms. Crowell had no personal knowledge that Mr. Sullivan was eavesdropping on her.  However, the essence of those claimed facts is contained in Inspector Zigmont's affidavit.  *See* Pls.' List of Filings [doc. # 353] Ex. 17.  The Sullivans also assert as fact that the Defendants had a duty to know about the housing court injunction and to include that in the arrest warrant application.  Yet,  the Sullivans offer no reason why this fact would have any bearing, much less be material, to a judge's determination of probable cause to believe that Mr. Sullivan had illegally eavesdropped on his mother.

Furthermore, utilizing the corrected affidavits doctrine and adding all of the allegedly exculpatory information that the Sullivans wanted added, the Court nonetheless concludes that there was sufficient truthful information in the affidavit to support a finding of probable cause.[25]  Inspector

---

[24]  For example, the Sullivans contend that Inspector Zigmont omitted the fact that the cassette discussed in the previous section demonstrated Ms. Crowell taped her own phone calls; that her relatives knew this; and that the State Defendants knew about the housing court action. Furthermore, the Sullivans contend that Inspector Zigmont omitted the fact that the Sullivans had not moved out of the Valley View residence.  Yet, Judge dos Santos's ruling rebuts that assertion.

[25]  Thus, the Court is willing, *arguendo* to add to the affidavit the following facts that the Sullivans claim were intentionally omitted from it:  that the Defendants knew on April 12 that Mr. Sullivan thought he was being set up; that the Defendants knew there was no evidence that the hardware seized from the premises could be used to tape phone calls; that the Defendants knew that the items seized from the living room window sill on January 25, 2001 had not been there on their

Zigmont had signed statements from Ms. Crowell, the alleged victim, Ms. Hyland, and Mr. Hyland, who found the equipment and listened to the audiotapes. *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[A] tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated is especially significant in establishing probable cause." (internal quotation marks omitted and alteration in original)); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."). Inspector Zigmont swore he had no reason to doubt Ms. Crowell's authenticity, *see* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 94, and the Sullivans have offered no evidence why in the circumstances, Inspector Zigmont should have been suspicious of Ms. Crowell.

To the extent that their adverse interests in the housing action should have caused Inspector Zigmont or a neutral judge to question the motives of Ms. Crowell or Mr. and Ms. Hyland, Inspector Zigmont included this fact in his arrest warrant application for the presiding judge to assess. *See Justin F.*, 476 F. Supp. 2d at 153 ("Thus, [the police officer] provided the prosecutor and the Superior Court Judge with all of the facts he had uncovered–even the conflicts in the stories of the

---

previous visit to the premises; that the Defendants knew that a cabinet in the living room had been full of dishes instead of audiotapes prior to the January 25, 2001 search; that the Defendants knew that the sales catalog for monitoring equipment seized in April had not been where it was seized when the Defendants were in the house in September 2000; and that Inspector Zigmont spoke to Mr. Hyland on April 19, 2001 about the catalogues Inspector Zigmont later seized. *See* Pls.' Am. Mem. in Opp'n to State Defs. [doc. # 349] at 2-5. The Court has also omitted from the application for these purposes Inspector Zigmont's observation that the equipment he seized from the residence could be used to taping phone calls. *Soares*, 8 F.3d at 920 (stating that "a court should put aside allegedly false material . . . and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause").

witnesses–so that the prosecutor and the judge could evaluate the allegations and the veracity of the witnesses for themselves.").  Inspector Zigmont also had the audiotapes and the opinion of Mr. Hyland, an engineer, that the equipment he saw attached to the phone lines could be used to tape conversations.  Finally, Inspector Zigmont had seized a sales catalog for Spy Shop LTD, containing notations in what he believed to be Mr. Sullivan's handwriting, and a receipt from that company for equipment billed to Mr. Sullivan's credit card.

While Inspector Zigmont was told by Mr. Sullivan's lawyer that Mr. Sullivan believed he was being "set up" on the eavesdropping charges, *see* Pls.' List of Filings [doc. # 353] Ex. 12, the "fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause, and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."  *Panetta*, 460 F.3d at 495-96  (internal quotation marks and citation omitted)); *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him.  Nor does it matter that an investigation might have cast doubt upon the basis for the arrest." (citation omitted)); *Justin F.*, 476 F. Supp. 2d at 154 ("The Second Circuit does not impose a duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." (internal quotation marks omitted)).

Therefore, because the Court concludes that there was probable cause to support the arrest warrant, no unlawful seizure occurred when Inspector Zigmont executed the warrant and arrested Mr. Sullivan.  Finally, even if the warrant fell short of probable cause, the Court concludes that, in the circumstances of this case, reasonable officers could disagree about whether there was probable cause to arrest Mr. Sullivan, and thus the Inspector Zigmont is protected by qualified immunity.  *See*

*id.* at 157 n.11 ("Even if the Court were wrong on the issue of probable cause, the Court would conclude that on the basis of the undisputed facts in the record, Sgt. Maloney had 'arguable probable cause' and that therefore, he would be entitled to qualified immunity on Plaintiffs' false arrest claim."); *Jenkins*, 478 F.3d at 87 ("An officer's determination is objectively reasonable if there was arguable probable cause at the time of arrest–that is, if officers of reasonable competence could disagree on whether the probable cause test was met." (internal quotation marks omitted)); *see also Simpson v. Denardo*, 2004 WL 1737444, at *8; *Szekeres v. Schaeffer*, No. Civ. 301CV2099(MRK), Civ. 301CV2108(MRK), 2004 WL 722240, at *5, *8 (D. Conn. Mar. 26, 2004). The Court finds that this test is more than satisfied in this case.[26] The Court therefore GRANTS State Defendants' Motion for Summary Judgment [doc. # 306] as to Plaintiffs' Fourth Amendment claims.

### D.  Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). The Sullivans ground their conspiracy claims against Inspectors Zigmont and Coffey on the Sullivans' contention that "[c]ompetent state investigators would have personally investigated the facts set forth by Mary Crowell in her alleged letter of complaint [and that] [t]his was not done." Pls.' Am. Mem. in Opp'n to State Defs. [doc. # 349] at 35. However, the

---

[26] Because the Sullivans' claims against Inspector Coffey arise from his involvement in the September 20, 2000 search and from his supervisory role over Inspector Zigmont, and because the Court has now determined that the September 20 search and every subsequent search and seizure by Inspector Zigmont was unobjectionable, no § 1983 claim arising under the Fourth Amendment may survive against Inspector Coffey.

Sullivans do not provide any evidence of "an agreement . . . to act in concert." *Pangburn*, 200 F.3d at 72; *see Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) ("[P]laintiff must provide some factual basis supporting a 'meeting of the minds,' such as that defendants 'entered into an agreement, express or tacit, to achieve the unlawful end.'"). And their bald assertion that the Inspectors should have done a more extensive investigation cannot itself provide any legitimate inference for a reasonable jury to conclude that there was an agreement between the Inspectors and Mr. Sullivans' relatives to violate the Sullivans' constitutional rights.

The Sullivans also allege a conspiracy on the basis of (1) investigational notes taken by Attorney Stephen Sedensky, who first received Ms. Crowell's criminal complaint, which indicate that Mr. Hyland did not contact the Farmington Police, and (2) later testimony in which Mr. Hyland allegedly stated that he did call the Farmington Police. Putting aside any issues of admissibility, it is unclear to the Court how this discrepancy in whom Mr. Hyland contacted when and why could possibly indicate an agreement between the State Defendants and Mr. Sullivan's relatives to violate the Sullivans' constitutional rights. Therefore, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 306] on the Sullivans' conspiracy claim.

### E.    Fifth and Fourteenth Amendment Claims

The Sullivans additionally assert that they were deprived of due process of law and equal protection under the Fifth and Fourteenth Amendments by the State Defendants' actions. Because neither Defendant is a federal actor, the Sullivans' Fifth Amendment claims must fail. *See Dusenbery*, 534 U.S. at 167 ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law." (internal quotation marks omitted)); *Bussey*, 419

50

F. Supp. 2d at 586 ("Bussey's due process claims are against state, not federal, actors, and thus the Fourteenth Amendment, rather than the Fifth Amendment, applies to these claims.").[27]  Moreover, the Sullivans have neither claimed that Mr. Sullivan was part of a protected class for the purposes of his equal protection claim, nor have they offered any evidence to suggest that Inspectors Zigmont or Coffey treated them any differently from any other similarly-situated individuals.  *See Clubside, Inc.*, 468 F.3d at 158-160 ("[P]laintiffs state an equal protection claim where they allege that they were intentionally treated differently from other similarly-situated individuals without any rational basis.").  Therefore, the Sullivans' Fourteenth Amendment equal protection claims also fail.

## F.   First Amendment Retaliation

The Sullivans finally contend that Inspectors Zigmont and Coffey retaliated against Mr. Sullivan for the political views he expressed on several audiotapes they listened to during the course of the criminal investigation against him.  Mr. Sullivan contends that Inspector Zigmont knew from listening to one of the tapes that Ms. Crowell taped her own telephone conversations and that Mr. Sullivan's relatives had framed him for the eavesdropping charges in order to coerce him and Mrs.

---

[27] Even were the Court to construe the Sullivans' Fifth Amendment claim as a Fourteenth Amendment Due Process Claim, the claim would necessarily fail for two reasons.  First, the Sullivans' claims against Inspectors Zigmont and Coffey arise solely from the searches and seizures discussed above, and as noted earlier, "[s]ubstantive due process analysis is . . . inappropriate . . . [where a] claim is 'covered by' the Fourth Amendment."  *Bryant*, 404 F.3d at 136 (alteration in original).  Second, "[g]overnment action . . . is not a substantive due process violation unless the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Lombardi*, 2007 WL 1148709, at *5.  "'[T]he touchstone of due process is protection of the individual against arbitrary action of government,' which in the substantive manifestation of due process is exhibited by 'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'"  *Id.* at *10 (quoting *Lewis*, 523 U.S. at 845-46 (alteration in original)).  The Inspectors' conduct falls far short of egregious or conscience-shocking, and was reasonably justified in the service of the legitimate governmental objective of investigating potentially criminal activity.

Sullivan into giving up their rights to the Valley View residence. The Sullivans argue that the State Defendants continued to investigate and prosecute Mr. Sullivan in order to retaliate against him for the criticism and dissatisfaction with Connecticut government that Mr. Sullivan expressed on the audiotapes and that he planned to telephonically broadcast in the future.

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695, 1701 (2006) (alteration in original and citations omitted). "To survive summary judgment on a section 1983 First Amendment retaliation claim a plaintiff must demonstrate that he engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant." *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006). "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley*, 268 F.3d at 73. "Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse . . . action even in the absence of the protected conduct." *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251-52 (2d Cir. 2006) (internal quotation marks omitted).

To the extent they criticized the Town of Farmington, the State of Connecticut, or the federal government, Mr. Sullivan's tapes and writings are protected speech under the First Amendment. The Court further assumes without deciding that, for the purposes of this motion, if Mr. Sullivan could prove a causal relationship between the exercise of his First Amendment rights and his criminal

investigation, arrest, or prosecution, those actions would qualify as adverse action for purposes his First Amendment claim. *See, e.g.*, *Gagliardi v. Fisher*, No. 06-0095, 2007 WL 853474, at *23 (W.D. Pa. Mar. 16, 2007) ("*Hartman* does not foreclose plaintiff's retaliatory investigation claim notwithstanding the court's determination that the ensuing investigation, search, arrest and prosecution were supported by probable cause."); *cf. Hartman*, 126 S. Ct. at 1705 n.9 ("No one here claims that simply conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort. . . . Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us.").

Where the Sullivans' claim fails, however, is that there is nothing in the record, even construed in the light most favorable to the Sullivans, that demonstrates either "improper motivation" on the part of Inspector Zigmont or that Mr. Sullivan's exercise of his First Amendment rights "motivated or substantially caused" Inspector Zigmont's investigation or Mr. Sullivan's arrest. *See Curley*, 268 F.3d at 73.

As an initial matter, Mr. Sullivan cannot demonstrate that his exercise of his First Amendment rights "motivated or substantially caused" his arrest because, as discussed above in the context of seizure, the arrest warrant was supported by probable cause, and it was signed by a Superior Court Judge. *See id.* ("As to the [causation] element, because defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken.").[28] Therefore, the State Defendants are entitled to summary judgment on Mr. Sullivan's

_____

[28] Ms. Crowell gave a signed statement swearing that she had not given consent to the taping of her conversations. "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has

retaliatory arrest claim.

Regarding improper motivation for the Inspectors' investigation of Mr. Sullivan, it is undisputed that Ms. Crowell's complaint was originally sent to the Statewide Bureau where the Inspectors worked, and that the case was assigned to them at that time. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 9. There has been no evidence that they actively solicited Ms. Crowell's complaint or assignment to investigate the complaint against Mr. Sullivan. While Mr. Sullivan broadly declaims that his mother's criminal complaint and the allegations of eavesdropping were trumped up in order to provide access to the premises to the State Defendants in order to prevent him from exercising his First Amendment rights, the Court has already dispensed with Mr. Sullivan's conspiracy claim, and Mr. Sullivan admitted in his deposition that he had no reason to believe that either Inspector Zigmont or Inspector Coffey knew of him before Ms. Crowell filed her criminal complaint. *See* Pls.' List of Filings [doc. # 353] Ex. 11 at 91-92. Moreover, both of the State Defendants have submitted evidence that they did not know of Mr. Sullivan before they were assigned to investigate Ms. Crowell's complaint in September 2000. *See* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 paras. 99, 106; Ex. 9 paras. 7, 37.[29]

---

probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119; *see Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."). There is nothing in the record to indicate "circumstances that raise[d] doubts as to" Ms. Crowell's veracity. *See Singer*, 63 F.3d at 119.

[29] Even after his initial interview of Ms. Crowell and alleged first exposure to Mr. Sullivan's political writings, Inspector Zigmont did not immediately seek an arrest warrant for Mr. Sullivan. Mr. Sullivan offers no evidence that Inspector Zigmont's method of conducting the investigation or his behavior changed after he became aware of Mr. Sullivan's political views. Indeed, Inspector Zigmont simply continued the investigation of a facially legitimate criminal complaint, which had at that point been bolstered by the sworn statements of both Ms. Crowell and Mr. Hyland and several

Furthermore, Mr. Sullivan testified that his one prior telephonic broadcast was only targeted to registered Farmington voters, *see* Pls.' List of Filings [doc. # 353] Ex. 11 at 111, and the State Defendants have offered unrebutted evidence that they were never registered voters in Farmington, *see* Local Rule 56(a)1 Statement [doc. # 308] Ex. 8 para. 110; Ex. 9 para. 41. Finally, there has been no evidence that either State Defendant ever listened to Mr. Sullivan's political tapes or read his political writings before Inspector Zigmont executed the search warrant on January 25, 2001. Therefore, there is no "[s]pecific proof of improper motivation" on the part of Inspectors Zigmont and Coffey in the initiation of the investigation. *Curley*, 268 F.3d at 73. Rank speculation about motivation, which is all Mr. Sullivan offers, is insufficient to carry his burden on this issue. *See, e.g.*, *Ferran*, 471 F.3d at 370 ("The Ferrans have simply not met their burden of demonstrating that the Town retaliated against them for exercising their First Amendment right to seek redress of their grievances."); *Curley*, 268 F.3d at 73 ("[P]laintiff has proffered no evidence of defendants' motive beyond the allegation in his amended complaint that defendants acted 'out of mean-spiritedness and with a deliberate view towards inflicting physical and emotional injury and economic loss upon the Plaintiff because of his First Amendment protected activities.' Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." (citation omitted)). Therefore, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 306] as to Mr. Sullivan's claim that Inspectors Zigmont and Coffey retaliated against him for exercising his First Amendment rights by investigating and arresting him.

The Sullivans bear an additional burden with respect to their retaliatory prosecution claim.

---

audiotapes which Mr. Hyland claimed were found among the Sullivans' belongings and which Ms. Crowell and Mr. Hyland asserted were recorded without their knowledge and permission.

As the Supreme Court noted in *Hartman*, 126 S. Ct. at 1703, "[a]lthough a . . . § 1983[] plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action, the need to demonstrate causation in the retaliatory-prosecution context presents an additional difficulty . . . ." In *Hartman*, the Supreme Court discussed at length the differences between a retaliatory prosecution claim and claims based on other forms of retaliatory action:

> When the claimed retaliation for protected conduct is a criminal charge, however, a constitutional tort action will differ from this standard case in two ways. . . . What is different about a prosecution case, . . . is that there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge. Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive. . . . The second respect in which a retaliatory-prosecution case is different . . . is that the requisite causation between the defendant's retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases, and the need to show this more complex connection supports a requirement that no probable cause be alleged and proven. . . . [Therefore,] a plaintiff . . . must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging.

*Hartman*, 126 S. Ct. at 1704-05.

Thus, the Sullivans need to both allege and prove that there was no probable cause to bring charges against Mr. Sullivan. This is because, in addition "to the factual difficulty of divining the influence of an investigator or other law enforcement officer upon the prosecutor's mind, there is an added legal obstacle in the long-standing presumption of regularity accorded to prosecutorial decision-making." *Id.* The showing necessary to overcome this legal presumption and bridge the gap between the Inspector's intent and the prosecutor's decision is a lack of probable cause, which

as discussed above, Mr. Sullivan has failed to demonstrate. *See id.* The charges against Mr. Sullivan were filed on May 10, 2001, the same day the arrest warrant was issued. The Court has already concluded that there was probable cause to support the warrant for Mr. Sullivan, and there is no evidence of any intervening event between that and the filing of the criminal charges, which would alter the finding of probable cause. Therefore, the State Defendants are entitled to summary judgment on the Sullivans' retaliatory prosecution claim.

The Sullivans finally allege that Inspector Zigmont retaliated against Mr. Sullivan by (1) unlawfully delaying his criminal case, (2) withholding exculpatory evidence, and (3) by physically releasing to the press notice of Mr. Sullivan's arrest, thereby affecting his credibility. Each of these claims is also without merit.

First, Mr. Sullivan has tendered no evidence that Inspector Zigmont made the decision to request continuances in Mr. Sullivan's criminal case. Second, as to Mr. Sullivan's assertion that Inspector Zigmont suppressed evidence, the only allegedly exculpatory evidence not dealt with already in this opinion is the equipment Inspector Zigmont seized from the Valley View residence on January 25, 2001 and the examples of handwriting from the audiotapes and merchandise catalogue. It appears from the record that Inspector Zigmont had responsibility for the handwriting samples as late as June 24, 2002. *See* Pls.' List of Filings [doc. # 353] Ex. 10 at 1. However, the Sullivans have failed to demonstrate that Inspector Zigmont had the responsibility of deciding when or whether to reveal the results of the investigations conducted by the State Attorney's Office or of deciding what evidence to test and how. In fact, Mr. Sullivan himself declares that it was Assistant State Attorney John Malone who represented that the equipment would be tested, not Inspector Zigmont. *See id.* Ex. 12A. And while it may well be true that individuals have a right to be free

"from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence," *Russo*, 479 F.3d at 208, that was not the case here. Mr. Sullivan was not detained during the pendency of his criminal trial, and unlike the police officers in *Russo*, there is no evidence here that Inspector Zigmont intentionally misstated evidence, hid any allegedly exculpatory evidence from the prosecutor and defendant, or that the testing of the electronic equipment would have been a "simple task." *Id.*

Third and finally, the Sullivans' allege that the State Defendants informed the media about Mr. Sullivan's arrest also must fail. However, according to Mr. Sullivan's own evidence, it was Chief State's Attorney John M. Bailey who issued the press release regarding Mr. Sullivan's prosecution, not either of the State Defendants. *See* Pls.' List of Filings [doc. # 353] Ex. 27. In fact, there is no evidence that either Inspector Zigmont or Inspector Coffey had any role in issuing this press release.

In summary, none of the Sullivans' First Amendment retaliation claims have merit. Accordingly, the State Defendants are entitled to summary judgment on those claims.

**V.**

In addition to alleging federal claims under § 1983 against the Municipal and State Defendants, the Sullivans also assert state law claims of intentional infliction of emotional distress against the Municipal Defendants and claims under the Connecticut Constitution against the State Defendants. Having dismissed all federal claims against the Municipal and State Defendants, the Court must determine whether to exercise its discretion to assert supplemental jurisdiction over the remaining state law claims against each of these defendants.

Under 28 U.S.C. § 1367(a) a court may in certain circumstances exercise supplemental

jurisdiction over a party or claim even though the Court otherwise lacks original federal jurisdiction over that party or claim. Section 1367(a) states, in pertinent part, as follows:

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . . Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). *See Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.3d 561, 576 (2d Cir. 1995). Thus, § 1367(a) "makes pendent party jurisdiction possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party." *Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000). However, "[t]he power to exercise supplemental jurisdiction pursuant to § 1367(a) need not be exercised in every case in which it exists. Supplemental jurisdiction remains a matter of discretion, not of right." *Aday v. Sony Music Entm't, Inc.*, No. 96 Civ. 0991(MGC), 1997 WL 598410, at *6 (S.D.N.Y. Sept. 25, 1997). "[T]he district court may exercise considerable discretion over what state claims it will include within its supplemental jurisdiction in a particular case . . . ." *Cushing v. Moore*, 970 F.2d 1103, 1110 (2d Cir. 1992).

In particular, a district court may decline to exercise its supplemental jurisdiction over a claim under subsection (a) if –

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which it has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). "In exercising its discretion with respect to retaining supplemental jurisdiction,

the district court must balance several factors 'including considerations of judicial economy, convenience, and fairness to litigants.'" *Correspondent Serv. Corp. v. First Equities Corp. of Fla.*, 338 F.3d 119, 126 (2d Cir. 2003) (quoting *Purgess v. Sharrock, M.D.*, 33 F.3d 134, 138 (2d Cir. 1994)).

The Court is aware that there might exist some degree of overlap between the still-pending federal claim against J.W. Green and the state law claims against the Municipal Defendants, but it is questionable whether that claim can be sustained in view of the Court's ruling on the State and Municipal Defendants' motions.[30]  Moreover, and in any event, the Court concludes that efficiency and fairness would best be served by declining to exercise supplemental jurisdiction over the state law claims against the Municipal and State Defendants. The Court bases its decision to refrain from exercising supplemental jurisdiction over the Sullivans' remaining state law claims against the Municipal and State Defendants on two considerations.  First, the remaining claims against the State Defendants and Defendants Whalen and Williams arise from completely different facts than the remaining claims against J.W. Green.  Second, the remaining claims against all of the Municipal and State Defendants are purely state law claims befitting the expertise and experience of a state court. Therefore, taking all factors into consideration, the Court believes it is in the interests of efficiency and fairness to refrain from exercising supplemental jurisdiction over the remaining state law claims. The Court therefore declines to exercise supplemental jurisdiction over any state law claims against

---

[30]  The Court  has now determined that there was no state actor involved in the removal of Mr. Sullivan's bulldozer from his property in September 2000, and therefore the Court will, by separate order, be instructing the Sullivans and the only remaining defendant, J.W. Green, to show cause why the only remaining federal claim should not also be dismissed.

any of the Municipal and State Defendants.[31]

## VI.

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the following motions for summary judgment: Municipal Defendants' Motion for Summary Judgment [doc. # 297] and State Defendants' Motion for Summary Judgment [doc. # 306]. The Court GRANTS the motions and directs the entry of summary judgment in favor of the Municipal Defendants and State Defendants on all federal claims under § 1983. The Court DENIES the motion for summary judgment on all state law claims asserted against the Municipal Defendants and State Defendants. However, the Court declines to exercise supplemental jurisdiction over those state claims and accordingly, DISMISSES all remaining state law claims for lack of jurisdiction. The Sullivans are free to pursue those claims in state court.


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


**Dated at New Haven, Connecticut: <u>May 30, 2007</u>.**

---

[31] The Sullivans are cautioned to be aware of the statutes of limitations governing any of their state law claims, for under 28 U.S.C. § 1367(d), the period of limitations for any pendent state law claim that is dismissed at the same time as or after the dismissal of a federal claim "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."